JOURNAL ENTRY AND OPINION
Defendant, Marcella Parker, appeals the verdict of Judge Nancy A. Fuerst finding her guilty on two counts of child endangering, R.C. 2919.22 (A) and (B) (2). Parker argues that while her actions may have been negligent she lacked any ingredient of criminality or intent. She claims the judge erred in finding that she endangered her niece and that these convictions are against the manifest weight of the evidence. We disagree and affirm.
On October 10, 1996, T.L., then three and one-half years old, toilet-trained, and in good health, was temporarily living at the home of her maternal aunt, Parker, located at 10625 Woodland Avenue, Cleveland, Ohio.
At 2:58 a.m. on October 10, 1996, Christian Flores, a paramedic with the Cleveland EMS, responded to a 911 call that a three-year-old female had suffered a seizure at the Woodland Avenue address. Upon arrival he found the child, naked, standing in the upstairs hallway and Parker, talking on a nearby telephone. Flores testified he found the child to be alert, oriented, able to answer questions with a nod of her head and that her skin was very hot to the touch. He also noted that the child had been bowel incontinent. Parker advised Flores that the child had experienced a seizure-like condition for about one minute.
Dr. Lisa Share, M.D., a third-year pediatric resident at University Hospitals, Rainbow Babies Children's Hospital emergency room, testified about her examination of T.L. Dr. Share noted that the child shook as she tried to examine her, but was calm and the shaking ceased when she was held by Parker. Because this shaking was suppressible, the child was not suffering a seizure. Dr. Share admitted that medical equipment and tests could not determine whether a person sustained an earlier seizure, but children might exhibit signs of lethargy, disorientation, or sleepiness following a seizure. T.L. did not exhibit such symptoms.
The physical examination of the child revealed bruising around her right eye and swelling over her right cheek bone. A perforated right tympanic membrane and bright red blood in her ear canal caused Dr. Share to conclude that the perforation was recent. She found the child's skin to be warm, reddish in color and swollen from her feet to mid-thorax and admitted her to the Pediatric Intensive Care Unit.
Dr. Share discussed the child's condition with Parker and was told that Parker, T.L. and two younger children had watched television and around 2:00 a.m. the child had an episode of urinary incontinence. Parker said she placed the child in a tub of warm water, only a few inches deep, and then noticed that the child's arms and legs were shaking, her eyes rolled back in her head and the child became stool incontinent. Parker also told Dr. Share the seizure-like episode lasted about three to four minutes, at which point the child could respond to her name and that T.L. had no history of seizure-like activity.
Margaret Melchreit, a licensed social worker in the Pediatric Intensive Care Unit, investigated concerns expressed by the hospital medical staff about the child's condition. She interviewed Parker at about 10:00 a.m. in the consultation room adjacent to Unit. She testified that Parker told her that Parker, T.L., and Parker's other children had been watching a video and T.L. fell asleep around 10:00 p.m. The child awoke around 2:00 or 2:30 a.m. after having experienced urinary incontinence. Parker told Melchreit that she ran bath water, placed the child into the bathtub, went into her bedroom and from that room noticed the child's hands go up in the air and her body begin to shake. She ran back into the bathroom, removed the child from the bathtub, and wrapped her in a blanket. Parker told Melchreit that the child's skin felt hot when she removed her from the tub, but she did not notice any redness of her skin. She then noticed that the child's eyes were rolling into the back of her head and that she was biting her tongue. The child was able to respond when Parker asked her whether she was okay. Parker denied hearing any water running into the bathtub after she placed T.L. in it.
Parker also told Melchreit that one week earlier she noticed a bruise around the child's eye and was told on September 29, 1996, by the child that she had fallen from a Big Wheel, a tricycle which sits about 12 to 18 inches above the ground. Parker also opined that an injury could have occurred when the child hit her head on the headboard on October 1, 1996, while jumping on a bed, an incident she learned of only after one of her children told her about it. Parker also vaguely mentioned a fall from a shopping cart.
When Melchreit asked Parker about discipline for the child and her own children, Parker said that she would "bop" them — take the palm of her hand and hit them on the head — or make them stand in the corner. Parker told Melchreit that she had been the child's sole care giver for the preceding two to three weeks and had "bopped" the child three days earlier.
Dr. Anthony Stallion, M.D., a pediatric surgeon, diagnosed the child's condition as second-degree burns, secondary to a scalding injury. He noted that the burns have bullai (blisters) beneath them that do not appear immediately after the injury and the depth of the scalding injuries would result in permanent scarring. He also testified that the fresh perforation of the child's tympanic membrane and the bruising in the area of the right eye indicated that the child had suffered a fairly substantial blow to the side of the head. While the membrane would heal, there would be scaring and, perhaps, some permanent hearing loss. Both the scalding and tympanic membrane injuries would have been painful.
Dr. Lolita McDavid, medical director of child protection, Rainbow Babies Children's Hospital, testified she treated the child about twelve hours after admission and the burns were still progressing. Both legs were burned all of the way around, a pattern that did not resemble a splash burn. Moreover, the inner folds of skin in the groin area were not burned which indicated that the child kept her legs closed because keeping the legs closed constituted an instinctive, protective reaction to immersion in an offending agent. Dr. McDavid said that two different factors impact the severity of a burn: the heat of the liquid and the amount of time in the liquid. Based upon the location and degree of these burns, Dr. McDavid believed that the child sustained them as the result of immersion into a hot liquid, most likely water. She also noted that if the child had experienced a seizure, she would have been unable to speak during the episode which was contrary to Parker's statements concerning T.L.'s ability to speak to her while in the bathtub.
Dr. McDavid also testified that falling off a Big Wheel would be an unlikely cause of a tympanic membrane injury, since the child was of an age where she would brace herself from a fall. If the membrane were injured as a result of a fall, a bruise would likely appear, whereas a slap to the side of the head could rupture the membrane but leave no bruise. The tympanic membrane also would not likely rupture from a shopping cart fall, as that type of fall would, most likely, reveal a bruise to the forehead or back of the head. Based upon her observations, Dr. McDavid believed the injuries were inflicted rather than accidental.
That same day, Carol Little, a social worker for the Cuyahoga County Department of Children and Family Services (CCDCFS), interviewed Parker at her home and noted there was no operating electric light in the bathroom and she could not see into the bathroom from Parker's (the only illuminated) bedroom. Parker told her that around 2:00 a.m. she began putting her children to bed, woke T.L., who was on the couch, and noticed that the child had wet herself. As they walked up the stairs to the bathroom, the child bumped her head on the wall. Parker told Little that she filled the bathtub with a small amount of water and placed the child in the bathtub, walked to her bedroom to get clean under clothing and heard the child cry. Parker relayed the same series of events to Little as she had to Melchreit but indicated that she brought the blanket-clad child to the bedroom where she laid her on the bed. At that point, she noticed that the child had a bowel movement but the child did not complain of any pain regarding her eye, ear, or her skin.
Parker also told Little that she could not understand how the child had red marks on her body because she did not have that much water in the bathtub. She also said that she did not know how the child suffered the eardrum injury, but did mention the "headboard" mishap.
Dina Yates, another intake social worker for the CCDCFS, testified that on October 11, she spoke with Parker at her home. Parker told her that the child wet herself on the couch, that she ran bath water for the child, and the child got in the bathtub on her own. When Yates asked her why the sole of the child's feet were not burned, Parker then said she lifted the child into the tub. Parker told Yates she had not checked the temperature of the water, noted the seizure and called 911.
Yates also testified that she met Parker at CCDCFS on two separate occasions eight days apart. At the first meeting, Parker said the child had gotten into the tub on her own; while at the second meeting, Parker told Yates that she had placed the child in the water. With regard to the injury to the child's eye and eardrum, Parker told Yates about both the "Big Wheel" and "headboard" incidents, but did not know which injury occurred at which time.
Erin Lear, an intake social worker for the CCDCFS and assigned to investigate the child's injuries, spoke with Parker and was told after realizing that the child had wet the bed, Parker changed the sheets and ran bath water. After running the water, she asked the child to get in and later, when looking into the bathroom, saw the child shaking. Parker then removed the child from the bathtub and called the EMS. Parker specifically told Lear that she had not tested the water and that the child climbed into the bathtub independently. When Lear questioned Parker about her methods of discipline she was told that normally Parker would have a child stand in the corner or, sometimes, she would slap them on the shoulder or arm.
Darcella Lambert, the child's natural mother, testified that T.L. had been living with Parker for about two weeks before the October 10th incident. She said that Parker had called her that morning to teLl her about the child climbing into the bathtub and the seizure and to ask whether she wanted Parker to call EMS. Parker told her that she had asked the child about the temperature of the water, and the child had told her that it was fine. Using three-way calling, Parker clicked off the line, called 911, and got back on Lambert's line to let her know that EMS was on its way. Lambert was still on the line when EMS arrived.
Two or three days before the incident, Lambert visited and noticed that her child had a small black mark under her right eye that Parker had told her resulted from T.L. falling off of a Big Wheel tricycle the day before and also that the child had hit her head while jumping on the bed. Lambert said that the child could climb in and out of a bathtub on her own "[l]ike everyone else, one foot at a time." She would also let Lambert know whether the water was the right temperature by pulling her foot out of the water. The child never experienced a seizure, was toilet trained by eighteen months and did not have accidents.
Deborah Casciato, a clinical social worker with the Metro Health Medical Center, Child and Adolescent Psychiatry Department, began treating the child in December 1996. Casciato diagnosed the child with an adjustment disorder, unspecified. She provided play therapy and addressed both the issue of any trauma the child might have suffered regarding her burns and the issues relating to separation from her birth mother. Through therapy, Casciato learned from the child that Parker had placed her into the bathtub.
Dianell Lambert, the child's grandmother who lived near Parker, testified that in the early morning hours of October 10, 1996, a child's scream coming from the general direction of Parker's home awakened her but admitted that she did not hear the sound of the ambulance arriving later. Mrs. Lambert stated when the child came to live with her after her stay in the hospital, the child was afraid to take a bath and would scream and complain about the water temperature, even though the water was not hot. She explained that, at the time of trial, fifteen months after the incident, the child still wore special stockings with gel pads on a twenty-four hour basis to prevent further scaring of the tissue on her legs.
Parker's sister, Vivian Green, testified on Parker's behalf. Like her mother, Dianell Lambert, Green lived near Parker. She testified when Parker and the child visited her in October 1996, she noticed a welt by the child's eye after the child had been playing outside. Green said that the other children told her that the child had fallen off of the Big Wheel.
Indicted on three counts of felonious assault, three counts of child endangering (felony 2) and three counts of child endangering (felony 3) on June 25, 1997, Parker waived her right to a jury trial. On February 10, 1998, Judge Fuerst returned a guilty verdict on only Count Four of the indictment, endangering a child in violation of R.C. 2919.22 (B) (2), and Count Seven, endangering a child in violation of R.C. 2919.22 (A). Parker was sentenced to four years of imprisonment on each count to run concurrent with each other.
Parker asserts two assignments of error.
 I. THE COURT ERRED IN FINDING THAT DEFENDANT ENDANGERED THE HEREIN VICTIM.
Parker argues that the state should have never brought any criminal charges against her. She claims to have acted rationally, not recklessly when she placed the child in a bathtub and the child did not complain about the water temperature. Further, the testimony of the medical experts showed that the injury to the ear canal could have occurred as a result from a fall off of a Big Wheel. Parker contends if she had intended to injure the child, the child would have feared her, and would not have calmed down in the emergency room when Parker held her. Thus, she argues, the state has shown nothing more than mere negligence, not a recklessness that would give rise to criminal liability.
In reply, the states argues that it properly established the applicable mental state of recklessness regardless of which story Parker told: (1) the child either entered the tub on her own; or (2) Parker placed her there. It claims Parker's assertion that the child did not cry out while she endured second-degree immersion burns is incredible in light of all the consistent medical expert testimony to the contrary. It is reckless to put a child into bath water that has not been tested and abusive to immerse a child in scalding hot water. It is also reckless to hit a child with such force that her eardrum ruptures. Therefore, the state argues, it clearly proved its case.
Parker apparently argues that the prosecution presented insufficient evidence to sustain convictions under R.C. 2919.22
(A) and (B) (2), but cites nothing in support of her first assignment of error except a case which discusses the civil law concept of "duty" in tort liability. In any event, R.C. 2919.22
provides the following in pertinent part:
 (A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * *, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection or support.
 (B) No person shall do any of the following to a child under eighteen years of age:
* * *
(2) Torture or cruelly abuse the child.
The culpable state of recklessness is an essential element of the crime of endangering children. State v. Adams (1980). 62 Ohio St.2d 151,404 N.E.2d 144, paragraph one of the syllabus; accordState v. O'Brien, (1987), 30 Ohio St.3d 122, 508 N.E.2d 144, paragraph one of the syllabus; State v. Williams (Hamilton 1984),21 Ohio App.3d 12, 14, 486 N.E.2d 113, 115. Section 2901.22 of the Ohio Revised Code defines the required culpable mental state of "reckless" as follows:
 A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
When a reviewing court addresses an assignment of error regarding the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus; accord Jackson v.Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560,573. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." State v. Thompkins (1997), 78 Ohio St.3d 380, 386,678 N.E.2d 541, 546. As the question of sufficiency of the evidence presents a question of law, it does not allow the reviewing court to weigh the evidence. State v. Martin (Hamilton 1983), 20 Ohio App.3d 172,175, 485 N.E.2d 717, 720-721, citing Jackson,443 U.S. at 319. The reviewing court will not disturb a verdict unless it determines that reasonable minds could not have reached the conclusion reached by the trier of fact. Jenks,61 Ohio St.3d at 273, 574 N.E.2d at 503.
Upon review of the evidence in a light most favorable to the prosecution, this Court is convinced that any rational trier of fact would have concluded that Parker had the requisite mental state of recklessness beyond a reasonable doubt. The uncontroverted testimony of the medical professionals who attended to the child's injuries showed that the her second-degree burn injuries resulted from immersion in scalding water. The child's buttocks had sustained the worst of the injury and her legs were uniformly burned, ruling out injury from splashing hot liquid. The folds of skin in the groin area were protected, indicating that she maintained a protective posture while immersed. Medical professionals also testified that degree of the burn depended upon the heat of the liquid and the length of time in the skin maintained contact with the liquid. All agreed that the child would have been in pain.
About the injury to the child's tympanic membrane, the uncontroverted testimony from medical experts showed that the child must have suffered a recent blow of significant force to her ear in order for the membrane to have ruptured. The testimony also indicated that the likelihood such an injury could result from a fall from a shopping cart or a Big Wheel tricycle — explanations given by Parker for the child's injuries — would be extremely small, and all agreed that the injury would have been painful. Parker had admitted to a social worker that she would discipline the child by "bopping" her on the head with an open hand.
The brief outline of the evidence produced by the prosecution against Parker underscores the culpable mental state of recklessness under R.C. 2919.22 (A) and (B) (2). The testimony regarding the types of injury sustained and the manner in which these injuries were sustained shows a heedless indifference to the consequences of the alleged actions and a perverse disregard of a known risk that these types of injuries would be sustained as a result of such actions. As such, the evidence submitted by the state satisfies the requisite element of recklessness. Therefore, Parker's first assignment of error is overruled.
Parker's second assignment of error states:
 II. THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Parker repeats the same arguments as those made in the first assignment of error but argues that the conviction on both counts was against the manifest weight of the evidence. "On the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact." State v. DeHass (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. An argument challenging a conviction on the weight of the evidence, rather than the sufficiency of the evidence, addresses "`the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" Tompkins, 78 Ohio St.3d at 387, 678 N.E.2d at 546, quoting Black's Law Dictionary (6 Ed. 1990) 1594. The "weight of the evidence" indicates to the trier of fact that the party having the burden of proof is entitled to their verdict if, upon weighing the evidence, the trier of fact finds that the greater amount of credible evidence sustains the issue which that party seeks to establish. Id. "`Weight is not a question of mathematics[; weight] * * * depends on its effect in inducingbelief." Id., quoting Black's, supra (alteration added).
A reviewing court, upon examination of the entire record, weighs the evidence and all reasonable inferences from that evidence, considers the credibility of witnesses, and determines whether, when "resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (Hamilton 1983), 20 Ohio App.3d 172,175, 485 N.E.2d 717, 720, as cited in Thompkins,78 Ohio St. 3d at 387, 678 N.E.2d at 547. When determining whether a verdict is against the manifest weight of the evidence, a reviewing court may consider various factors, including the certainty of the evidence, the reliability of the evidence, whether a witness had been impeached, and an "awareness that even a reviewing court is not required to accept as true the incredible." State v. Clark (Cuyahoga 1995), 101 Ohio App.3d 389,408, 655 N.E.2d 795, 806-807, providing additional factors. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin, 20 Ohio App.3d at 175,485 N.E.2d at 720-721.
Upon our review of the record and application of the standard of review set forth above, this Court cannot say that this is an exceptional case where the evidence weighed heavily against the convictions. Rather, the weight of the evidence supports the convictions on both child endangering counts. The evidence submitted by the prosecution, which tended to show that the child's injuries resulted through Parker's recklessness, was reliable and credible. Moreover, this same evidence ruled out the possibility, as Parker argues here, that the child's injuries could have occurred through some unfortunate mishap of the child's own doing. Parker's second assignment of error is overruled.
The judgment is affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
KENNETH A. ROCCO, P.J., CONCURS SEPARATELY;PATRICIA ANN BLACKMON, J., CONCURS IN JUDGMENT ONLY.
 ___________________ JUDGE ANNE L. KILBANE